lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CITIFINANCIAL AUTO,      ) | |
|             ) | |
|        Appellant,   ) | |
| v.         ) | |
|             ) | Case No. 06-2527-JAR |
| LISA LYNNE HERNANDEZ-SIMPSON  ) | |

CITIFINANCIAL AUTO,

       Appellant,

v.

LISA LYNNE HERNANDEZ-SIMPSON

       Appellee.

Case No. 06-2527-JAR

---

FORD MOTOR CREDIT COMPANY,

       Appellant,

v.

BRETT BURGESS & JANET BURGESS

       Appellees.

Case No. 06-2528-JAR

---

CITIFINANCIAL AUTO,

       Appellant,

v.

LINDA WALLACE

       Appellee.

Case No. 06-2530-JAR

---

FORD MOTOR CREDIT COMPANY,

       Appellant,

v.

CHRISTINE PARKER

       Appellee.

Case No. 06-2531-JAR

FORD MOTOR CREDIT COMPANY,        )
                                  )
                Appellant,        )
v.                                )        Case No. 07-2085-JAR
                                  )
MICHAEL D. SCHEERER and           )
GUADALUPE SCHEERER,               )
                                  )
                Appellees.        )
_____)

### MEMORANDUM ORDER AND OPINION

This appeal involves five Chapter 13 bankruptcy cases in which the debtors' plans were confirmed over objection of a creditor, Citifinancial Auto f/k/a TranSouth Financial ("Citifinancial") or Ford Motor Credit Company ("Ford Motor Credit"), that holds a purchase money lien against debtors' vehicles. In each case, the vehicle was purchased within 910 days of the date the bankruptcy was filed. The bankruptcy court ruled that neither Citifinancial nor Ford Motor Credit was entitled to interest on its claim. Citifinancial and Ford Motor Credit appealed from the orders of confirmation, and the cases were consolidated for appeal (Doc. 5).[1] For the reasons explained in detail below, the Orders of the bankruptcy court are reversed, and the cases are remanded for further proceedings consistent with this opinion.

I.      **Background**

        A.      **Citifinancial v. Lisa Lynne Hernandez-Simpson**

On October 24, 2004, debtor Lisa Lynne Hernandez-Simpson obtained financing for a 2000 Dodge Durango from Citifinancial, which properly perfected its purchase money security interest ("PMSI") in the vehicle. Hernandez-Simpson concedes that the vehicle was acquired for

---

[1]Wells Fargo Financial and the Kansas Bankers Association have submitted an Amicus Brief in support of appellants' position requesting reversal of the bankruptcy court's Orders of confirmation (Doc. 11).

her personal use within 910 days of the filing of her petition Chapter 13 bankruptcy.  At the time

of filing, $16,789.68 remained owing on the contract, as reflected in Citifiancial's timely filed

proof of claim.  Hernandez-Simpson filed an amended Chapter 13 plan in which she proposed to

retain the Durango and pay Citifinancial's secured claim in full, with no interest.

Citifinancial objected to the plan, asserting that its claim was subject to treatment under

the "hanging paragraph" at the end of § 1325(a) and the present value claims of §

1325(a)(5)(B)(ii), and thus Hernandez-Simpson must pay interest on the amount pursuant to the

United States Supreme Court's ruling in *Till v. SCS Credit Corp.*[2] (the "*Till* rate").  The

bankruptcy court held a hearing on November 7, 2006, at which time the plan was confirmed

over Citifinancial's objection, holding that *Till* did not apply to Citifinancial's claim and no

interest was required.

### B.      Citifinancial v. Linda Wallace

On October 16, 2004, debtor Linda Wallace obtained financing for a 2000 Buick LeSabre

from Citifinancial, which properly perfected its PMSI in the Buick.  Wallace concedes that the

vehicle was acquired for her personal use within 910 days of filing her Chapter 13 petition.  At

the time of filing, $14,472.92 remained owing on the contract, as reflected in Citifinancial's

timely filed proof of claim.  Wallace's Chapter 13 plan proposed to pay Citifinancial's claim in

full, with no interest.

Citifinancial objected to the plan, asserting that its claim was subject to treatment under

the "hanging paragraph" at the end of § 1325(a) and the present value claims of §

1325(a)(5)(B)(ii), and thus Wallace must pay interest on the amount at the *Till* rate.  The

---

[2]541 U.S. 465 (2004).

bankruptcy court held a hearing on November 7, 2006, at which time the plan was confirmed over Citifinancial's objection, holding that *Till* did not apply to Citifinancial's claim and no interest was required.

### C.      Ford Motor Credit v. Christine Parker

On August 25, 2004, debtor Christine Parker purchased a 2004 Ford Explorer from Shawnee Mission Ford, obtaining financing from Ford Motor Credit, which properly perfected its PMSI in the Explorer.  Parker concedes that the vehicle was acquired for her personal use within 910 days of filing her Chapter 13 petition.  At the time of filing, $21,523.42 remained owing on the contract, as reflected in Ford Motor Credit's timely filed proof of claim.  Parker's Chapter 13 plan proposed to pay Ford Motor Credit's claim in full, with no interest.

Ford Motor Credit objected to the plan, asserting that its claim was subject to treatment under the "hanging paragraph" at the end of § 1325(a) and the present value claims of §1325(a)(5)(B)(ii), and thus Parker must pay interest on the amount at the *Till* rate.  The bankruptcy court held a hearing on November 7, 2006, at which time the plan was confirmed over Ford Motor Credit's objection, holding that *Till* did not apply to Ford Motor Credit's claim and no interest was required.

### D.      Ford Motor Credit v. Michael and Guadalupe Scheerer

On August 9, 2004, debtors Michael and Guadalupe Scheerer purchased a 2004 Ford F-150 from Extreme Ford in Overland Park, Kansas, obtaining financing from Ford Motor Credit, which properly perfected its PMSI in the F-150.  The Scheerers concede that the vehicle was acquired for their personal use within 910 days of filing their Chapter 13 petition.  At the time of filing, $23,031.22 remained owing on the contract, as reflected in Ford Motor Credit's

timely filed proof of claim.  The Scheerers' Chapter 13 plan proposed to pay Ford Motor Credit's claim in full, with no interest.

Ford Motor Credit objected to the plan, asserting that its claim was subject to treatment under the "hanging paragraph" at the end of § 1325(a) and the present value claims of § 1325(a)(5)(B)(ii), and thus the Scheerers must pay interest on the amount at the *Till* rate.  The bankruptcy court held a hearing on December 5, 2006, at which time the bankruptcy court overruled Ford Motor Credit's objections, holding that *Till* did not apply to Ford Motor Credit's claim and no interest was required.  The plan was later confirmed at a January 16, 2007 hearing.

### E.    Ford Motor Credit v. Brett Burgess and Janet Burgess

On May 8, 2004, debtors Brett and Janice Burgess purchased a 2004 Ford Taurus from Shawnee Mission Ford, obtaining financing from Ford Motor Credit for the purchase.  Ford Motor Credit properly perfected its PMSI in the Taurus.  To obtain financing for the Taurus, the Burgesses traded in an older vehicle on which $7,895.85 was still owing.  This trade-in balance was added to the contract along with a service contract and "gap insurance" that insured the vehicle from the time of purchase until the Burgesses were able to purchase full auto insurance.  The total amount financed was $24,500.98 to be paid at 8.99% interest over 60 months, at $510.38 per month.

The Burgesses concede that the Taurus was acquired for their personal use within 910 days of the filing of their Chapter 13 bankruptcy petition.  At the time of filing, $17,178.63 remained owing on the contract, as reflected in Ford Motor Credit's timely filed proof of claim.  The Burgess' Chapter 13 plan proposed to bifurcate the claim pursuant to 11 U.S.C. § 506 and pay Ford Motor Credit $9,925.00 as a secured claim, reflecting the contract balance with the

5

trade-in value deducted and paid as an unsecured claim.  The trade-in value would then be paid

as an unsecured claim, which would likely mean that Ford Motor Credit would not receive any

payment for the trade-in.

Ford Motor Credit objected to bifurcation of its claim under the plan, asserting that its

entire claim was a PMSI subject to treatment under the hanging paragraph at the end of §

1325(a) and the present value requirements of § 1325(a)(5)(B)(ii), and thus debtors must pay

interest on the entire claim at the *Till* rate.  A hearing was held on November 7, 2006, at which

time the bankruptcy court overruled Ford Motor Credit's objections, but found that the plan as

originally proposed could not be confirmed.  The bankruptcy court made an oral ruling that the

portion of Ford Motor Credit's claim that represented the amount of debtors' trade-in was not

part of the PMSI and, as such, was an unsecured claim.  The bankruptcy court further held that

although the claim was not subject to

§ 506 bifurcation and valuation, *Till* did not apply to Ford Motor Credit's claim, and no interest

was required on the PMSI portion, which must be paid in full, with accrued interest to the

petition date, but without post-petition interest.

The bankruptcy court requested counsel for the Burgesses to prepare a supplemental

order of confirmation reflecting its rulings and invited Ford Motor Credit to file an amended

proof of claim.  Instead, a standard confirmation order was prepared by the Chapter 13 Trustee

and filed on November 14, 2006, and a Notice of Appeal was filed before the Supplemental

Order of Confirmation was filed.

## II.    Appellate Jurisdiction

The parties have opted to have the appeal heard by this Court.[3]  These appeals were timely filed by Citifinancial and Ford Motor Credit, and the bankruptcy court's Orders are "final" within the meaning of 28 U.S.C. § 158(a)(1).[4]

## III.   Standard of Review

On appeal from the bankruptcy court, the district court sits as an appellate court.[5]  The standards generally governing review of the bankruptcy court's decision are well-settled: findings of fact are not to be set aside unless clearly erroneous; conclusions of law are reviewed *de novo*.[6] The bankruptcy court's interpretation of a statute is a question of law.[7]

## IV.   Analysis

At issue in these five cases is whether a bankruptcy court may confirm, over a secured creditor's objections, a Chapter 13 plan that provides that the debtor may retain a vehicle secured by a PMSI purchased within 910 days of the bankruptcy filing without paying interest on the claim.  Ford Motor Credit raises an additional issue with respect to the nature and extent of its PMSI in the Burgess case.  The Court addresses each issue in turn.

### A.   Are the Creditors Entitled to Interest on Their Claims Under *Till*?

---

[3]*See* 28 U.S.C. § 158(c)(1); B.A.P. 10th Cir. R. 8001-1(a), (e).

[4]*See* Fed. R. Bankr. P. 8001-8002.

[5]*See* 28 U.S.C. § 1334(a).

[6]*Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849, 851 (10th Cir. 1990); *In re Barber*, 191 B.R. 879, 882 (D. Kan. 1996); *see* Fed. R. Bankr. P. 7052, 8013.

[7]*In re Overland Park Financial Corp.*, 236 F.3d 1246, 1251 (10th Cir. 2001) (citing *Rushton v. State Bank of S. Utah (In re Gledhill)*, 164 F.3d 1338, 1340 (10th Cir. 1999)).

The requirements for confirmation of a Chapter 13 plan are set forth in 11 U.S.C. § 1325.
Section 1325(a)(5) provides for the required treatment of "allowed secured claims."  Section
1325(a)(5) requires that a Chapter 13 plan must provide one of two alternatives to secured
creditors if the bankruptcy estate contains secured property and the holder of the secured claim
does not accept the plan: (1) the debtor may surrender the creditor's secured collateral per §
1325(a)(5)(C); or (2) the plan must provide that the creditor retains its lien until satisfaction or
discharge, and that "the value, as of the effective date of the plan, of property to be distributed
under the plan on account of such claim is not less than the allowed amount of such claim," per §
1325(a)(5)(B).[8]  In each of the five cases involved in this appeal, the debtors elected to keep their
vehicles and thus their plans were required to comply with § 1325(a)(5)(B).

With the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 ("BAPCPA") on October 17, 2005, § 1325 is now qualified by an unnumbered "hanging
paragraph" located at the end of subsection (a), which states, in relevant part:

> For purposes of paragraph (5), section 506 shall not apply to a
> claim described in that paragraph if the creditor has a purchase
> money security interest securing the debt that is the subject of the
> claim, the debt was incurred within the 910-day [sic] preceding the
> date of the filing of the petition, and the collateral for that debt
> consists of a motor vehicle (as defined in Section 30102 of title 49)
> acquired for the personal use of the debtor. . . .[9]

Section 506(a)(1) states that:

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest . . . is a secured claim to the extent

_____

[8]11 U.S.C. § 1325(a).

[9]11 U.S.C. § 1325(a).

of the value of such creditor's interest in the estate's interest in
such property. . . .[10]

Before the enactment of BAPCPA, a secured creditor's claim could be bifurcated into
secured and unsecured portions, depending on the value of the collateral securing the debt.[11]
Such claims were said to be "crammed down" to the value of the collateral.[12]  The Supreme
Court in *Till* held that payment of this "value" further required that secured creditors should be
paid interest on the secured portion of their claim over the life of the plan to comply with §
1335(a)(5)(B).[13]  This "value" has uniformly been interpreted to mean that the creditor was
entitled to interest on its secured claim, to represent the time value of money, to guard against
inflation, and to factor in the risk of nonpayment.[14]  Thus, debtors were required to provide
interest on the secured claim at a rate that started with the national prime rate, with an adjustment
for risk of non-payment.[15]  This modified "prime-plus" formula is typically referred to as the
"*Till* rate."[16]

The issue on appeal is whether the rationale in *Till* still applies to these so-called "910
claims" such that interest should be paid on such balance.  In other words, does the hanging
paragraph permit a Chapter 13 debtor to cram down a 910 claim without paying full principal

---

[10]11 U.S.C. § 506(a)(1).

[11]*In re Vega*, 344 B.R. 616, 620 (Bankr. D. Kan. 2006).

[12]*Id.*

[13]*Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004).

[14]*Id.*

[15]*In re Lowder*, 2006 WL 1794737, at *5 (Bankr. D. Kan. June 28, 2006) (Karlin, J.).

[16]*Id.*

and interest?  Many courts have considered how the hanging paragraph is to be construed, with

three interpretations of the 910 claim language emerging.  The first interpretation, which has

been adopted by the vast majority of courts considering the issue, holds that the hanging

paragraph "means only that the claims [the Section] describes cannot be bifurcated into secured

and unsecured portions under § 506(a)."[17]  This interpretation has the effect of quantifying a 910

creditor's claim at the balance due to the creditor on the petition date and assumes that a 910

creditor's claim is a secured claim.[18]

Under the second interpretation, creditors holding 910 claims are not entitled to secured

claims for purposes of § 1325(a)(5) because the hanging paragraph prohibits application of

§ 506(a) to 910 claims and § 506 is the only path to the establishment of a secured claim for

bankruptcy purposes.[19]  Instead, a creditor with a 910 claim "must receive the greater of: (1) the

full amount of the claim without interest; or (2) the amount the creditor would receive if the

---

[17]*In re Brown*, 339 B.R. 818, 820 (Bankr. S.D. Ga. 2006).  This majority interpretation has been adopted, with some small variations in the following opinions: *In re Henry*, 353 B.R. 261(Bankr. D. Or.); *In re Murphy*, 352 B.R. 340 (Bankr. M.D. Ga. 2006); *In re Trejos*, 352 B.R. 249 (Bankr. D. Nev. 2006); *In re Turner*, 349 B.R. 437 (Bankr. D. S.C. 2006); *In re Osborn*, 348 B.R. 500 (Bankr. W.D. Miss. 2006); *In re Brown*, 346 B.R. 868 (Bankr. N. D.Fla. 2006); *In re Sparks*, 346 B.R. 767 (Bankr. S.D. Ohio 2006); *In re Brown*, 346 B.R. 246 (Bankr. M.D. Ga. 2006); *In re Soards*, 344 B.R. 829 (Bankr. W.D. Ky. 2006); *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006); *In re Brooks*, 344 B.R. 417 (Bankr. E.D. N.C. 2006); *In re Bufford*, 343 B.R. 827 (Bankr. N.D. Tex. 2006); *In re Scruggs*, 342 B.R. 571 (Bankr. E.D. Ark. 2006); *In re Montoya*, 341 B.R. 41 (Bankr. D. Utah 2006); *In re DeSardi*, 340 B.R 790 (Bankr. S.D. Tex. 2006); *In re Fleming*, 339 B.R. 716 (Bankr. E.D. Mo. 2006); *In re Wright*, 338 B.R. 917 (Bankr. M.D. Ala. 2006); *In re Enzell*, 338 B.R. 330 (Bankr. E.D. Tenn. 2006); *In re Robinson*, 338 B.R. 70 (Bankr. W.D. Mo. 2006); *Lowder*, 2006 WL at 1794737.

[18]*See e.g., Brown*, 339 B.R. at 820.

[19]*In re Carver*, 338 B.R. 521 (Bankr. S.D. Ga. 2006) (Walker, J.); *In re Green*, 348 B.R. 601 (Bankr. M.D. Ga. 2006) (Walker, J.).

claim were bifurcated and crammed down (*i.e.*, secured portion paid with interest and unsecured portion paid pro rata)."[20]

By contrast, the bankruptcy court in this case adopted a variation of the minority view, which construes the language of § 1325(a)(9) as written, leaving a creditor with an allowed claim for the entire prepetition debt that must be paid in full but without postpetition interest through the duration of the Chapter 13 plan.[21]  The bankruptcy court did not issue an opinion in the cases involved in this appeal, but instead set forth its reasoning in a previous case, *In re Wampler*.[22]  In that case, the bankruptcy court discussed what constituted an "allowed secured claim."[23]  To be entitled to a payment of "not less than the allowed amount of such claim" under § 1325(a)(5)(B)(ii), a creditor must first have an "allowed secured claim provided for by the plan."[24]  Because the term "allowed secured claim" is not defined in the Bankruptcy Code, the bankruptcy court looked to the language of § 502, which defines whether a proof of claim is "allowed," and § 506, which refers to "[a]n allowed claim of a creditor secured by a lien" in concluding that "[t]he provisions of §§ 502 and 506, read together, establish the *only* means by

---

[20]*Carver*, 338 B.R. at 528.

[21]*In re Wampler*, 345 B.R. 730, 735 (Bankr. D. Kan. 2006) (Berger, J.) (citing 8 Collier on Bankruptcy ¶ 1325.06[1][a] at 1325 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2006)).

[22]345 B.R. at 730.  Wells Fargo, the creditor in *Wampler*, appealed to the Tenth Circuit BAP and, upon petition, certified the matter for a direct appeal to the Circuit pursuant to 28 U.S.C. § 158(d)(2).  Before the briefs were filed, the debtors in *Wampler* amended their Chapter 13 plan to surrender the vehicle, and the appeal was dismissed as moot.  On May 9, 2007, Judge Berger issued an opinion reiterating his position in *Wampler*, and confirming Chapter 13 plans in four cases where the creditors holding 910 claims are to be paid no interest.  *In re Kinsey*, — B.R. —, 2007 WL 1366385 (Bankr. D. Kan. May 9, 2007).

[23]*Wampler*, 345 B.R. at 735-36.

[24]*Id.*

which a court may determine that an allowed claim should be allowed as a secured claim."[25]
Because the hanging paragraph states that § 506 "shall not apply," and § 506 is necessary in the
bankruptcy court's view, to define "allowed secured claim," the bankruptcy court determined
that "if § 506 does not apply, a creditor may be entitled to an allowed, albeit *unsecured* claim."[26]
As such, the creditor was entitled to be paid its contract balance, but was not entitled to interest
on that claim because the requirement that the creditor receive the "value, as of the effective date
of the plan" only applied to secured claims.[27]  The bankruptcy court thus, in effect, converted
what would be a PMSI under state law into an unsecured claim for purposes of the Bankruptcy
Code.  In so ruling, the bankruptcy court adopted the interpretation held by a leading bankruptcy
treatise *Collier on Bankruptcy*, which purports to construe the 910 claim language as it is
written:

> Language added at the end of section 1325(a) by the 2005
> amendments to the Bankruptcy Code removes certain claims from
> the protections of section 1325(a)(5).  This new language states
> that for purposes of section 1325(a)(5), section 506 shall not apply
> to certain claims.  Such claims, therefore, cannot be determined to
> be allowed secured claims under section 506(a) and are not within
> the ambit of section 1325(a)(5). . . . It is possible that this language
> [the hanging paragraph] was intended to prohibit the use of section
> 506(a) to bifurcate a secured claim into an allowed secured claim
> and an allowed unsecured claim as part of the cramdown permitted
> by section 1325(a)(5)(B) and, therefore, that such claims should be
> treated as fully secured claims regardless of the value of the
> collateral.  But, even if that was the intent, because the new
> language added to section 1325(a) renders entirely inapplicable for
> some creditors the only section, section 506(a), that gives those

---

[25] *Id*. at 736 (emphasis added).

[26] *Id.* (emphasis added).

[27] *Id*. at 740.

creditors allowed secured claims, it does not carry out such intent. In fact, earlier versions of the 2005 bankruptcy legislation had contained language which eliminated only the section 506(a) bifurcation of certain claims into secured and unsecured claims based on the value of the property, but did not eliminate their status as allowed secured claims. However, that language was not retained. Courts are required to implement the language of the statute and not what they think Congress might have intended instead.[28]

The bankruptcy court then concluded:

The statutory construction explained by *Collier* and adopted by this Court is most in concert with the plain reading of the amendment and hence, in conformity with the interpretive dictate of the U.S. Supreme Court that "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."[29]

After reviewing the respective analyses, this Court respectfully disagrees with the bankruptcy court and adopts the majority view. Few courts would disagree that the hanging paragraph is poorly drafted.[30] This makes it difficult to determine what the statute is intended to mean, particularly when trying to fit the hanging paragraph into the context of preexisting provisions of Chapter 13.[31] Construing § 506 to be the exclusive source of a claim's status as an "allowed secured claim," however, is at odds with both precedential and contextual analysis, as articulated in the majority interpretation.

---

[28]8 Collier on Bankruptcy ¶ 1325.06[1][a] at 1325-28 to 1325-29.

[29]*Wampler*, 345 B.R. at 737 (quoting *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (quotation omitted)).

[30]For an extensive analysis of plain meaning, textualism and context with respect to the hanging paragraph, *see In re Trejos*, 352 B.R. 249, 255-64 (Bankr. D. Nev. 2006).

[31]*Id*. at 261, n.17.

The Court finds particularly persuasive the reasoning set forth in *In re Brown*,[32] where the bankruptcy court considered arguments similar to those now before this Court.  The court in *Brown* stated, and this Court concurs, that if a debtor contends that without the operation of  § 506 an "allowed secured claim" cannot exist, then that debtor "misunderstands the purpose and operation of  § 506.[33]  The court in *Brown* cited to the United States Supreme Court case of *Dewsnup v. Timm*[34] where the Supreme Court held that the words "allowed secured claim" need not be read as an indivisible term of art defined by reference to § 506(a), which by its terms is not a definitional provision.[35]  Rather, the words should be read term-by-term to refer to any claim that is, first, allowed, and second, secured.[36]  The court in *Brown* stated that

> It is neither necessary nor appropriate to contort § 506(a) into a definitional provision.  Other Code sections address whether a claim is "allowed" and "secured."  11 U.S.C. § 502 governs whether a claim is deemed allowed. "A claim or interest, proof of which is filed under section 501 of this title, is
> deemed allowed, unless a party in interest . . . objects. . . . 11 U.S.C. § 101 establishes that a debt is "secured" by a lien.  *See* § 101(37) ("The term 'lien' means charge against or interest in property *to secure payment of a debt*. . . .") (emphasis added). . . . Because the 910 Claims are "allowed" under § 502 and "secured" by recourse to underlying collateral, they are "allowed secured claim[s] as contemplated by § 1325(a)(5).  The 910 claims are

---

[32]339 B.R. 818 (Bankr. S.D. Ga. 2006).

[33]*Id*. at 821.

[34]502 U.S. 410 (1992).

[35]*Id*. at 415.

[36]*Id*.

14

thus included in the present value requirements of §1325(a)(5)(B)(ii).[37]

The Court agrees that it is both "unnecessary and inappropriate to 'contort' § 506(a) into a definitional provision where other sections of the Code address whether a claim is 'allowed' and/or 'secured.'"[38] Thus, the Court must look to other sections of the Bankruptcy Code or applicable non-bankruptcy law to find a definition.[39] Section 502(a) determines whether a claim is deemed "allowed," and provides in relevant part, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . . objects."[40] Because no objections have been filed to the creditors' respective proofs of claim, in accordance with § 502(a), the 910 claims of Citifinancial and Ford Motor Credit are deemed "allowed." Section 101(37) establishes that a debt is "secured" by a lien, and states "[t]he term 'lien' means charge against or interest in property to secure the payment of a debt or performance of an obligation."[41] There is no question that Citifinancial and Ford Motor Credit hold valid PMSI's against debtors' vehicles that secure payment of the underlying debts.[42] Accordingly, the creditors' claims are "secured." Thus, because the 910 claims are deemed "allowed" under §

---

[37]*Brown*, 339 B.R. at 821.

[38]*In re Murphy*, 352 B.R. 340, 351 (Bankr. M.D. Ga. 2006) (citing *Brown*, 339 B.R. at 821)).

[39]*Id.*

[40]11 U.S.C. § 502(a).

[41]11 U.S.C. § 101(37).

[42]The nature and extent of Ford Motor Credit's PMSI in the Burgess' vehicle is discussed *infra*.

502(a) and "secured" under § 101(37), the claims are "allowed secured claims" and § 1325(a)(5)

applies to require payment of those claims on the basis of their present value.[43]

Moreover, as noted by the bankruptcy court in *In re Montoya*,[44]

> The *existence* of a claim is usually determined by non-bankruptcy
> substantive law, whereas *valuation* of that claim is determined by §
> 506.  A purchase money security interest is secured through the
> parties' contract and applicable perfection statutes and is secured
> without the operation of the Code.  A creditor's secured status is
> not erased without any further adjudication merely because the
> hanging paragraph makes the § 506 valuation mechanism
> inapplicable to 910-day vehicle claims.[45]

The court in *Montoya* also pointed out that the hanging paragraph begins with the phrase, "[f]or

purposes of paragraph (5).  To give meaning to this phrase, the bankruptcy court must consider

§ 1325(a)(5) when contemplating confirmation. . . . [or] the introductory phrase and its

subsequent provisions would be rendered meaningless."[46]  Thus, the grammatical structure of the

hanging paragraph supports the conclusion that § 1325(a)(5) remains applicable to 910 claims.

Accordingly, this Court joins the majority of courts in concluding that the language of the

hanging paragraph in § 1325(a) stating that § 506 "shall not apply" to 910 claims merely

prevents debtors from bifurcating a secured creditor's claims into secured and unsecured

portions on newly-acquired vehicles.  It does not change the secured creditor's claim into some

new, undefined category of unsecured claim.[47]  Because 910 claims are "allowed secured claims"

---

[43]*Brown*, 339 B.R. at 821.

[44]341 B.R. 41 (Bankr. D. Utah 2006) (Boulden, J.).

[45]*Id*. at 44 (internal citations omitted) (emphasis added).

[46]*Id*.

[47]*In re Lowder*, 2006 WL 1794737, at *6 (Bankr. D. Kan. June 28, 2006).

under the Code, interest must be paid on them at the *Till* rate to compensate the holder of the claim for its lost value in receiving deferred payments.  Accordingly, the Orders of the bankruptcy court confirming the Chapter 13 plans are reversed.

**B.     Does Ford Motor Credit Hold a PMSI in the Burgess' Vehicle for the Entire Amount Financed?**

In all of the cases save one, there is no question that the creditors hold a PMSI for the full amount of their claims.  In the Burgess case, however, the Court must determine the additional issue of the nature and extent of Ford Motor Credit's PMSI in the 2004 Taurus.  The bankruptcy court held that the debtors could not bifurcate Ford Motor Credit's claim, as it was entitled to the protections under § 1325(a).  The bankruptcy court also held, however, that the portion of Ford Motor Credit's claim that represented the amount of debtors' trade-in value was not part of the PMSI and, as such, was an unsecured claim. The bankruptcy court held further that with respect to the remaining portion of the claim that was a PMSI, *Till* did not apply and no interest was required on the secured portion.

Whether a creditor has a PMSI securing a debt is a matter of state law.[48]  The law of the State of Kansas is applicable here, as the transaction occurred in Kansas.  Under revised § 9-103(b)(1) of the Uniform Commercial Code, as adopted and modified in Kansas, "[a] security interest in goods is a purchase-money security interest . . . [t]o the extent that the goods are purchase-money collateral with respect to that security interest."[49]  "Purchase-money obligation" is defined as "an obligation of an obligor incurred as all or part of the price of the collateral or

---

[48]*In re Billings*, 838 F.2d 405 (10th Cir. 1988).

[49]K.S.A. 84-9-103(b)(1).

for value given to enable the debtor to acquire rights in or the use of the collateral if the value is

in fact so used."[50]   "The 'price' of collateral or the 'value given to enable' includes obligations

for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties,

finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative

charges, expenses of collection and enforcement, attorney's fees, and other similar

obligations."[51]   Thus, in order to have a PMSI, an otherwise secured party must satisfy two key

elements: (1) that the money loaned or credit extended made it possible for the debtor to obtain

the collateral; and (2) that the debtor used the funds supplied to acquire rights in the collateral.[52]

In addition to the foregoing definitions, § 9-103(f) provides:

> A purchase-money security interest does not lose its status as such,
> even if:
> (1) the purchase-money collateral also secures an obligation that is
> not a purchase-money obligation;
> (2) collateral that is not purchase-money collateral also secures the
> purchase-money obligation; or
> (3) the purchase-money obligation has been renewed, refinanced,
> consolidated or restructured.[53]

According to paragraph 7.a. of the Official Comment to § 9-103, the foregoing language of sub-

paragraph (f) approves what courts have referred to as the "dual-status rule."[54]   Under that rule, a

---

[50]K.S.A. 84-9-103(a)(2).

[51]K.S.A. 84-9-103 cmt. 3.

[52]K.S.A. 84-9-103(g); *In re Vega*, 344 B.R. 616, 622 (Bankr. D. Kan. 2006) (citing Keith G. Meyer, *A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code*, 50 U. Kan. L. Rev. 143, 156 (2001)).

[53]K.S.A. 84-9-103(f).

[54]K.S.A. 84-9-103(f) cmt. 7.a.

18

security interest may be part purchase-money and part non-purchase money.[55]  This rule is in contrast to the "transformation rule," which provides that any cross-collateralization, refinancing, or the like destroys the purchase-money status.[56]  When Kansas adopted the 2001 amendments to Article 9 of the Uniform Commercial Code, the legislature deleted proposed language to subparagraph (f) that limited its applicability to non-consumer transactions.[57]  Thus, as enacted, this section applies to both consumer and non-consumer transactions in Kansas.

The debtors claim, and the bankruptcy court held, that Ford Motor Credit's claim is not secured by a PMSI to the extent that part of the contract balance reflects the amount remaining on the Burgess' trade-in vehicle.  The bankruptcy court held that the inclusion of such amounts removed that portion of the contract price from treatment as a PMSI, and left it as an unsecured claim.  Ford Motor Credit contends that the definition of a PMSI includes all amounts financed that enable a debtor to acquire rights in the collateral, including the value of a trade-in vehicle.

In support of their argument, the debtors direct the Court to a case decided by another bankruptcy court in this District,  *In re Vega*,[58] which involves a factual situation and legal issues similar to the case at bar.  In *Vega*, the debtors executed a loan contract and security agreement for the purchase of a vehicle in April 2004.[59]  In December 2005, 15 days prior to filing their

---

[55]*Id.*

[56]*Id.*

[57]*Vega*, 344 B.R. at 623, n.29 (citations omitted). The legislature also declined to adopt subsection (h), which generally leaves courts free to continue to apply established approaches in determining whether a security interest loses its PMSI status in consumer-goods transactions.  *Id.*

[58]344 B.R. at 616.

[59]*Id.* at 617.

Chapter 13 bankruptcy petition, the debtors entered into a second loan contract with the same

creditor for the purchase of a second vehicle.[60]  The parties agreed that the lien on the first

vehicle would be released and that the balance owed on the first vehicle would be "rolled into"

the new note, and the total amount would be secured by the second vehicle.[61]  The debtors kept

the first vehicle, which was free and clear of liens.[62]  The "cash price" for the second vehicle was

$6,793.98, and the total amount of the second loan was $8,789.98.[63]

The debtors' Chapter 13 plan proposed to pay $6,794 to the creditor, the purchase price

of the second vehicle, and to surrender the first vehicle in full satisfaction of the amount rolled

into the second loan, which was the balance owed on the first vehicle.[64]  The debtors argued that

their plan did not violate the anti-bifurcation provision of the hanging paragraph because they

proposed to pay the full purchase price of the second vehicle plus interest, over the life of the

plan.[65]  The creditor argued that the hanging paragraph required the entire contract balance to be

paid with interest.[66]  After considering the definition of "purchase money obligation" and the

dual-status rule as adopted in Kansas, the bankruptcy court held that the creditor had not met its

burden to show that the entire amount loaned in 2005 made it possible for the debtors to

purchase the second vehicle, or that the debtors used the entire amount loaned to acquire rights

---

[60] *Id.*

[61] *Id.* at 618.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 621.

[66] *Id.* at 619.

in the vehicle.[67]   Thus, the extent of the creditor's PMSI was limited to the purchase price of the second vehicle, plus any interest that has accrued on the purchase price, minus any payments that might have been received on the loan.[68]   The bankruptcy court concluded that the debtors' plan complied with the hanging paragraph in § 1325(a) by providing for full payment of the portion of the secured creditor's claim representing its PMSI in the second vehicle.[69]

Ford Motor Credit argues that *Vega* can be distinguished from this case because the funds advanced to pay the negative equity in essence "enabled" the Burgesses to purchase the 2004 Taurus and should be counted as part of the purchase price.  The Court disagrees.  When negative equity is financed with a new transaction, courts typically find that the negative equity is not included within a party's PMSI for purposes of § 1325(a)'s hanging paragraph.[70]  Although Ford Motor Credit may have been unwilling to lend money on the purchase of the new vehicle barring payoff of the trade-in balance, this is merely an accommodation that facilitates the transaction.  The Burgesses were not required to pay off the existing loan to gain a legal interest in the new Taurus.  Thus, the "value given to enable" debtors to obtain rights in the new vehicle did not include the negative equity on the trade-in vehicle.  Moreover, the funds loaned to satisfy the negative equity are "not a component of the price of the collateral or the value given to enable the debtor to acquire rights in the collateral," and are significantly and

---

[67]*Id*. at 622.

[68]*Id*.

[69]*Id*. at 623.

[70]*In re Bray*, —B.R.—, 2007 WL 1095435, at *11 (Bankr. W.D. Tenn. Apr. 11, 2007); *In re Westfall*, —B.R.—, 2007 WL 981730, at *5 (Bankr. N.D. Ohio, March 30, 2007); *In re Price*, —B.R.—, 2007 WL 664534, *6 (Bankr. E.D. N.C. Mar. 6, 2007); *In re Peaslee*, 358 B.R. 545, 557 (Bankr. W.D. N.Y. 2006).

qualitatively different from the fees, freight charges, storage costs, taxes, and similar expenses that are typically part of a motor vehicle sale.[71]

> As recently explained by the bankruptcy court for the Western District of New York,

> > Providing a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle, is not value given to "enable" that consumer to acquire rights in or the use of the replacement collateral. The term "enable" refers to what it has always referred to, which is the value given to allow the debtor to pay, in whole or in part, the actual price of a new item of collateral being acquired, in these cases the replacement vehicles themselves. . . .[72]

Ford Motor Credit urges the Court to consider the case of *In re Graupner*,[73] where the bankruptcy court in the Middle District of Georgia concluded that, under Georgia's Motor Vehicle Sales Financing Act ("MVSFA"), "price" includes the payment of negative equity, so reading MVSFA statute *in pari material* with the Uniform Commercial Code provisions adopted into Georgia statutory law, "price" under the definition of purchase money obligation includes payment of negative equity.[74] As a result, notwithstanding "the seemingly obvious conclusion" that the creditor "does not hold a purchase money security interest," the court held that the price paid, including the negative equity, was a purchase money obligation, resulting in a PMSI, and therefore subject to the hanging paragraph.[75] It is clear to this Court, however, that the *Graupner*

---

[71] *Price*, 2007 WL 664534, at *6.

[72] *Peaslee*, 358 B.R. at 557. *Accord Westfall,* 2007 WL 981730, at *5; *Price*, 2007 WL 664534, at *6.

[73] 356 B.R. 907 (Bankr. M.D. Ga. 2006).

[74] *Id*. at 920-21.

[75] *Id*. at 917, 923.

court's reliance on Georgia statutory law makes that case easily distinguishable and therefore of little persuasive value.[76]

In this case, as in *Vega*, there are "two separate financial transactions memorialized on a single retail installment contract document for the convenience of some consumers and to allow the auto industry to sell more vehicles, which is good for both parties."[77]  However, "the debt incurred in the separate optional transaction where negative equity is refinanced as part of the combined transaction does not result in a purchase-money security interest."[78]  Consequently, Ford Motor Credit does not have a PMSI for the full amount of its claim.  Instead, under the dual-status rule, the excess trade-in balance is an unsecured antecedent debt, which is not entitled to purchase-money treatment under § 1325(a).[79]  The extent of Ford Motor Credit's PMSI in the 2004 Taurus is limited to the purchase price of that vehicle, plus any interest that has accrued, minus any payments that may have been received on the loan.[80]  The bankruptcy court's order is affirmed with respect to this issue.[81]

---

[76]Kansas does not have a similar MVSFA.  *See Westfall*, 2007 WL 981730, at *6.

[77]*Price*, 2007 WL 664534, at *6.

[78]*Id*.

[79]*See Vega*, 344 B.R. 616, 623 n.29 (Bankr. D. Kan. 2006).

[80]*Id*. at 622.

[81]The Court recognizes that this result differs from several of the other courts that have interpreted that negative equity is not a part of the creditor's PMSI.  *See, e.g., Peaslee*, 358 B.R. at 559; *Westfall*, 2007 WL 981730, at *8; *Price*, 2007 WL 664534, at *11.  In those cases, the version of § 9-103 of the UCC enacted in the respective jurisdictions appears to have included the language making subparagraph (f) (imposing the dual-status rule) applicable only to non-consumer transactions and also include subparagraph (h), which allows the use of the transformation rule in consumer transactions.  Using the transformation rule, those courts found that the claim was not a PMSI.  As previously discussed, Kansas courts would use the dual-status rule to find that a refinancing or consolidation does not destroy PMSI status as to the eligible portion of the loan.  *See Vega*, 344 B.R. at 623 n.29. *Cf. In re Stevens*, —B.R.—, 2007 WL 1175487, at *3 (Bankr. D. Neb. Apr. 9, 2007) (applying Nebraska version of § 103 of the UCC, which is similar to the version adopted by Kansas).

23

Here, the debtors' Chapter 13 plan proposed to bifurcate Ford Motor Credit's claim and cram down the secured claim by paying the value of the Taurus, with interest.  The bankruptcy court, however, held that Ford Motor Credit's claim was not subject to § 506(b) bifurcation and ordered the PMSI portion of Ford Motor Credit's claim paid in full, with no interest, in accordance with its interpretation of the hanging paragraph in § 1325(a).  Because this Court has reached a different conclusion on this issue, the Chapter 13 plan as confirmed does not meet the provisions of § 1325(a) in providing full payment of that portion of Ford Motor Credit's claim representing its PMSI in the 2004 Taurus, with interest.  Thus, the order of the bankruptcy court is reversed on this issue.

**IT IS THEREFORE ORDERED BY THE COURT** that the Orders of the bankruptcy court confirming debtors' Chapter 13 plans are REVERSED and the cases are REMANDED to the bankruptcy court for proceedings consistent with this opinion.

Dated this  17th  day of May 2007.          S/ Julie A. Robinson
                                            Julie A. Robinson
                                            United States District Judge